STATE OF NEW JERSEY (TOWNSHIP OF WILLINGBORO), PLAINTIFF-APPELLANT, v. BOSTON JUVENILE SHOES, DEFENDANT-RESPONDENT.

Argued October 12, 1971—Decided March 6, 1972.

*Mr. Sanford Soren* argued the cause for appellant.

*Mr. Alton Silverman* argued the cause for respondent.

The opinion of the Court was delivered by

SCHETTINO, J. Defendant was convicted in the Township of Willingboro Municipal Court of violating a township ordinance requiring payment of an annual licensing fee for each sign displayed in specified commercial zones. Fined $25 plus $5 costs, defendant appealed to the Burlington County Court. After its *de novo* consideration of the matter, the court upheld the conviction and imposed the identical penalty. The Appellate Division reversed, *State of New Jersey (Township of Willingboro) v. Boston Juvenile Shoes,* 113 *N. J. Super.* 258 (App. Div. 1971). We granted certification. 58 *N. J.* 329 (1971).

Defendant operates a retail juvenile shoe store in Willingboro Plaza, a large shopping center. Although the record lacks perfect clarity, it seems that three types of signs exhibited by defendant prompted this controversy:

(1) A permanent, electrically illuminated sign bearing the designation "Stride-Rite Shoes." Shoppers continuously

walk under this sign, that is suspended from a canopy covering a walkway in front of the store.

(2) A permanent sign, painted on the inside of a clear glass door, which reads, "Boston Juvenile Shoes, Stride-Rite Shoes."

(3) One or two signs that apparently existed only during 1967, fastened inside the store window during certain months to advertise a sale.

Chapter 17 of the Willingboro Ordinances governs the displaying of signs. The measure defines the sign types allowable for various districts and purposes. It imposes a permit requirement with a $10 application fee for most signs and an additional $5 annual licensing fee for signs displayable in business or industrial zones. There are various restrictions, including one that requires commercial signs to relate directly to business activities conducted on the premises and another which limits the extent to which signs may cover building window space. Where any sign menaces the health, safety, morals or general welfare of the community, the township manager shall order remedial measures.

The Willingboro building inspector provided the only testimony during the county court proceeding. He indicated that defendant had obtained a permit for the signs displayed during 1967 and 1968. However, the annual license fees required by the ordinance were paid for neither year.

Since the Appellate Division could find no statutory delegation of power to support the provisions of the ordinance, it reversed the conviction. The court rejected the township's assertion that *N. J. S. A.* 40:69A–29, 30, two Faulkner Act provisions specifically relied upon to support the ordinance, provide authorization for the enactment.

Because the Faulkner Act guarantees to municipalities which select an optional governmental structure under its terms the municipal powers delegated generally by other enactments, see *N. J. S. A.* 40:69A–26, 28, this case could be decided without delineating the ambit of the substantive authority granted directly by its terms. *N. J. S. A.* 40:48–2,

which grants general police powers to municipalities, *Fred v. Old Tappan Borough,* 10 *N. J.* 515, 520 (1952), has been construed by this Court to provide authority for municipal licensing of canvassing and soliciting.[1] We have moreover deemed the statute to permit the exaction of a licensing fee designed to defray the costs of regulation. See *Moyant v. Paramus,* 30 *N. J.* 528, 542–546 (1959).

■ Like soliciting and canvassing, signs have often been subject to municipal regulation. See *United Advertising Corp. v. Borough of Metuchen,* 42 *N. J.* 1 (1964); *United Advertising Corp. v. Borough of Raritan,* 11 *N. J.* 144 (1952); *State v. Steiner,* 7 *N. J. Misc.* 1056, 147 *A.* 746 (Sup. Ct. 1929); *N. J. S. A.* 40:52–1, subd. h; *Carlin v. City of Palm Springs,* 14 *Cal. App.* 3d 706, 712, 92 *Cal. Rptr.* 535, 539 (Ct. App. 1971). Moreover, regulatory intent has frequently been implemented by permit and license requirements. See *United Advertising Corp. v. Borough of Raritan, supra; Federal Advertising Corp. v. Hardin,* 137 *N. J. L.* 468 (Sup. Ct. 1948); *State v. Steiner, supra;* 7 *McQuillin, Municipal Corporations* (3d. ed. 1968), § 24.380, at 327; *N. J. S. A.* 40:52–1, subd. h. Clearly, *N. J. S. A.* 40:48–2 grants the requisite power for a provision regulating signs, and the Faulkner Act applies that power to municipalities which, like Willingboro, have been organized under its terms

■ Because the Appellate Division decision, at the very least, implies a narrow interpretation of *N. J. S. A.* 40:69A–29, the "General Powers" provision of the Faulkner Act,

---

[1]The statute provides:

Any municipality may make, amend, repeal and enforce such other ordinances, regulations, rules and by-laws not contrary to the laws of this state or of the United States, as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants, and as may be necessary to carry into effect the powers and duties conferred and imposed by this subtitle, or by any law.

we deem it advisable to deal with that measure additionally.[2] It contains a comprehensive grant of power to municipalities which utilize a Faulkner governmental structure. "Local Self-Government in New Jersey: A Proposed Optional Charter Plan" (Feb. 1949), comments at 43, 45; see *Kennedy v. City of Newark*, 29 *N. J.* 178, 184 (1959); *Wagner v. City of Newark*, 24 *N. J.* 467, 475 (1957). *N. J. S. A.* 40:69A–30 indicates that "[t]he general grant of municipal power contained in [sections 26 through 30] is intended to confer the greatest power of local self-government consistent with the Constitution of this State." We are directed to construe liberally all grants of power to Faulkner municipalities. (See also *N. J. Const., Art. IV,* § *VII, par.* 11). Powers specifically enumerated shall be treated as additional and supplementary to those bestowed in general terms. This expression of legislative intent makes our course clear. We hold that the Faulkner Act, with or without reference to *N. J. S. A.* 40:48–2, grants ample authority to support an ordinance regulating signs.

We return to Chapter 17 of the township ordinances to consider whether it is a valid exercise of the power available to the municipality. A complete review of its provisions must precede that determination. Such a review is not an easy task, since the enactment frequently expresses its requirements in ambiguous terms.

The ordinance is broad in scope, encompassing most conceivable sign types within its terms. A permit must be obtained, prior to erecting, maintaining, removing, altering or repairing any sign exceeding two square feet of area. Each

---

[2]In pertinent part, the statute provides:

Each municipality governed by an optional form of government pursuant to this act shall, *subject to the provisions of this act or other general laws*, have full power to:

\*    \*    \*    \*    \*    \*    \*    \*

(b) *adopt and enforce local police ordinances of all kinds and impose penalties . . . for the violation thereof;* . . . and to exercise all powers of local government in such manner as its governing body may determine. (Emphasis supplied.)

permit application, excepting those for certain signs expressly excluded from the requirement, shall be accompanied by a $10 payment. Permit denials may be appealed to the Board of Adjustment. An additional $5 annual licensing fee shall be paid for each sign displayable in a business or industrial zone. As noted previously, the defendant's failure to comply with this last requirement prompted this proceeding.

The enactment at great length specifies the sign types allowed for certain municipal districts and purposes. The township has not contended that defendant's signs are not permitted under these provisions. The building inspector can issue less expensive, short-term permits for temporary, free-standing signs advertising special sales or other special promotion activities. Additionally, the ordinance enables him to issue temporary sign permits for other special events in the community. Neither of these provisions mentions the annual licensing fee.

It is unlawful to erect and maintain in Willingboro any sign not complying with the ordinance terms. Under a catch-all provision of another chapter, a fine of up to $500 and 90 days imprisonment can be imposed upon violators of the sign ordinance. Two other provisions of Chapter 17 are important to this case. Where the township manager determines "that any sign . . . constitutes a menace to the health, safety, morals, or general welfare of the community," he shall require remedial measures by the owner and the occupier. Where the objectionable condition remains uncorrected after 10 days, the manager shall rectify it at their expense. No more than 50 percent of the total building window glass area may be covered by signs, up to a six foot level.

Under these terms, the permit, permit fee and licensing fee requirements literally apply to defendant's three types of signs — the permanent, substantial sign suspended from the canopy, the trade name painted on the glass door, and the

signs fastened inside the store window during certain months to advertise a sale.[3] Of special importance to the last application, this would hold true, no matter how brief the actual display period. Section 10, which provides for certain temporary signs, does not seem to afford special treatment to temporary window signs. Its subsection which empowers the building inspector to issue less expensive, short-term permits for temporary signs advertising special sales or other promotion activities and which, by omitting any mention of it, might be construed as requiring no license fee in such cases is limited to free-standing signs. The ensuing subsection affords special treatment to temporary signs used for "other special events in the community"; its terms would not seem to embrace the typical window sign used for advertising purposes. The sweeping language of the permit requirement likewise becomes most burdensome in this context. A permit must be obtained not only prior to posting such a sign, but additionally before it may be "maintained, removed, altered or repaired."

The ordinance does not itself declare the municipal purposes to be furthered by its various terms. The township would justify its application to window signs — like those displayed by defendant — on grounds that the measure enables the building inspector to check building windows, thus assuring that they are not covered with signs to the extent that free visibility into building interiors would be impaired. As will be recalled, the ordinance sets a standard in this regard, limiting coverage to 50 percent of the total glass area, up to a six-foot height. Excessive sign posting on or near

---

3Attempting to protect its ordinance, the township has conceded the inappropriateness of applying its licensing fee requirement to the trade name painted on the glass door. Since the record does not indicate whether the failure to pay the fee for that sign influenced the penalty imposed, and because the ordinance terms would seem to require such a payment, we shall nevertheless include that application of the ordinance in this discussion.

windows obscures building interiors, so that fire and criminal activity cannot be detected.[4]

■ Accepting the proposition that a municipality may adopt measures to assure an unimpeded view into commercial premises, the question remains whether the chosen means of achieving that end bears a real and substantial relation to it. See *Katobimar Realty Co. v. Webster*, 20 *N. J.* 114, 123 (1955); *Schmidt v. Board of Adjustment*, 9 *N. J.* 405, 416 (1952). Signs, of course, are not the only impediment to vision, but in any event, we do not find a reasonable connection between the municipal objective and the Willingboro measure. To require the commercial occupier to apply for a permit and pay the concomitant fee for every sign greater than two square feet in area that he posts on his window, without regard to the relationship between the size of the sign or signs and the 50 percent visibility standard mentioned above; and indeed to obtain such permit and pay an annual licensing fee without regard to the period for which each sign will appear, seems too burdensome for the end in view. If, as the municipality says, a view of the interior is the objective, it is readily achieved by a prescription of the visibility required and penal prosecution for any violation of that standard. Upon what is before us, we cannot find any significant contribution toward that legislative goal in the permit and licensing provisions.

■■ We hold, accordingly, that the annual licensing fee requirement is invalid as it applies to window signs like those exhibited by defendant. Additionally, the provisions calling for a permit and the accompanying $10 payment, insofar as they may be directed at insuring compliance with the glass coverage restriction, are likewise invalid.

■ As for substantial, exterior signs — like that involved here — the township asserts that the ordinance enables the

---

[4]The township contends additionally that inspecting window signs helps to prevent fires. Any fire hazard would inhere in their cardboard or paper makeup as such, rather than in their use as signs. Already enacted fire prevention measures would therefore appear adequate for dealing with this problem.

building inspector to examine such signs individually, to insure that they remain securely affixed to the supporting structure. Cf. *Belleville Chamber of Commerce v. Town of Belleville*, 51 *N. J.* 153, 156 (1968). Should such a sign fall, there would be a great likelihood of injury to pedestrians walking below. We uphold the Willingboro ordinance in this respect.

Since we have thus far upheld the ordinance as it applies to such signs, we must address ourselves to defendant's other attacks upon the measure in that context. The ambiguities in the enactment persuade us to consider only those criticisms which relate directly to the provision violated — the licensing fee requirement — and defer determining the merits of others until set in an appropriate factual context and fully argued before us.

Some of these attacks so obviously lack persuasiveness that they need not be mentioned; others deserve passing comment. Limiting the licensing requirement to signs displayed in business or industrial zones is plainly grounded in logic. The likelihood of injury from a falling sign in such locations exceeds many times over that inherent in less crowded districts. There exists a presumption that licensing fees are reasonably related to the expense of regulation. *Gilbert v. Town of Irvington*, 20 *N. J.* 432, 435 (1956). It follows from the lack of patent unreasonableness and defendant's failure to adduce supportive evidence that we must reject such criticism.[5] That the enactment fails to expressly oblige the township to inspect need concern us only when the failure to inspect appears before us. The sufficiency of the regulatory aspects of the ordinance has not been challenged. Compare *Silco Automatic Vending Co. v. Puma*, 108 *N. J. Super.* 427, 432 (App. Div. 1970).

---

[5] As indicated, the building inspector quantified his inspections at four to six per year. Substantial exterior signs are normally erected permanently, or for a significant time duration. In such a context, the fees do not seem patently unreasonable.

The Appellate Division's reversal of the conviction is affirmed, insofar as it invalidated the conviction for failing to pay the license fees for window signs. But we hereby uphold the conviction for non-payment of the exterior sign license fee and, thusly, reverse the Appellate Division in that regard. The matter is remanded to the County Court for adjustment of the penalty in light of this opinion.

*For modification*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*Opposed*—None.